[Crim. No. 12539. In Bank. June 19, 1969.]

In re H. B. SEARS on Habeas Corpus.

H. B. Sears, in pro. per., and Thomas M. McGurrin, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Derald E. Granberg and Eric W. Collins, Deputy Attorneys General, for Respondent.

TOBRINER, J.—In 1961 a jury found H. B. Sears (hereinafter designated defendant) and his codefendants, Donald Ketchel and Thomas Sears, guilty of first degree murder and first degree robbery. The jury reached a verdict of life imprisonment for defendant and rendered a death penalty verdict for his codefendants. In *People* v. *Ketchel* (1963) 59 Cal.2d 503 [30 Cal.Rptr. 538, 381 P.2d 394], we affirmed the judgment against defendant; the judgment became final. Defendant brought this petition for a writ of habeas corpus alleging that *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], and *Roberts* v. *Russell* (1968) 392 U.S. 293 [20 L.Ed.2d 1100, 88 S.Ct. 1921], require that the remittitur in *People* v. *Ketchel, supra,* 59 Cal.2d 503, be recalled as to him.

We have concluded that the writ should be issued, the remittitur recalled, the judgment of conviction reversed, and

the cause remanded for further proceedings. The trial court, after denying defendant's motion for a separate trial, permitted the introduction of the confession of a codefendant. Despite the rendition of a limiting instruction, the introduction of that confession denied to defendant his federal constitutional right of confrontation under the *Bruton* holding. Furthermore, we find a reasonable possibility that such evidence contributed to the verdicts against defendant; the error was not harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

We summarized the circumstances involved in this case in *People* v. *Ketchel* (1963) 59 Cal.2d 503 [30 Cal.Rptr. 538, 381 P.2d 394]. For the purposes of this action we quote parts of that opinion.

"On Friday, June 9, 1961, about 8:45 p.m., Ketchel and Thomas Sears entered the Star Market in Monterey Park. Each held up a cashier at her respective checkstand near the market's entrance. Each stood with his gun in hand as he waited for the cashier to take the money from the cash drawer and put it in a brown paper bag. The two robbers left the market, each carrying his bag of money. They put their guns in their belts, apparently walked rapidly or ran through the parking lot of the market down a public alley leading into Alhambra Street. Both wore slacks, hip-length sports coats, dark glasses and hats. Meanwhile, as soon as the robbers left the checkstands, the cashiers pressed hidden emergency alarm buttons.

"George Elder, a policeman of Monterey Park who was off duty and dressed in levis and T-shirt, drove into the parking lot at about the time Ketchel and Thomas Sears were approaching a shed at the end of the parking lot facing Alhambra Street. Elder parked his car, apparently saw the two robbers at some distance under suspicious circumstances, and began chasing them. As he pursued the fleeing robbers, he called out 'Hold it' or 'Halt,' and then, when the two robbers ran between the parked cars and behind the shed, he started firing.

"In the melee Ketchel and Thomas Sears separated, darting between the cars. Both were trying to reach the car they had left parked on Alhambra Street some 75 feet distant from the intersection with the alley. Ketchel fired one shot, which struck Elder and caused him to fall to the street. As he lay there, Elder continued to fire his gun, directing his shot toward the waiting car and the two robbers who were running in that

general direction. Ketchel turned into the alley, escaped down the street, and ultimately, on his own, took a cab to the town of Whittier. Thomas Sears reached the waiting car, turned and fired several shots at Elder, and then made his 'getaway' in the car.

"Elder was struck by two bullets, one from Ketchel's gun and one from Thomas Sears' gun; either shot was sufficient to have brought about his death. . . . The autopsy surgeon testified that in his opinion Elder did not die immediately from the bullet wounds but remained alive for a short time until the ensuing hemorrhages precluded the continuance of vital body functions. During the interval Elder retained the ability to see, hear and speak.

"Several persons witnessed the shooting and surrounding events. One testified that as he stopped to help Elder who was lying in the middle of the street, Elder said, 'Star Market holdup. I have been shot. Three suspects in a '49 Ford. Call the police, call the police, call the police, call the police.' Another witness said that when he approached Elder about the same time, Elder mumbled, 'I'm okay. Tell them it was a . . . blue and white Ford.'

"Other witnesses, driving from the market, heard the exchange of gunshot, turned around and saw a car speed by them through the approaching darkness without any headlights. Meanwhile the police had received the robbery alarm and began checking cars answering the general description given in the radio call. About 9:30 p.m. that evening the police stopped a maroon-colored 1949 Ford sedan, which was being driven by H. B. Sears and occupied by Thomas Sears. This interception took place 2 miles from the Star Market and a half mile from the Sears' apartment. The police searched the car and interrogated the men as to their possession of concealed money or weapons; finding neither, the police, after a 10-minute check, released them both.

"The record reveals some conflict as to who, at the time of the crime, June 9, 1961, owned this 1949 Ford car. According to the pink slip, Ketchel, the owner, transferred the car to H. B. Sears on June 8, 1961, but in subsequent talks with the police H. B. Sears maintained that he did not buy the car from Ketchel until June 11, 1961. On Monday, June 12, 1961, H. B. Sears took the slip to the Department of Motor Vehicles for transfer.

"This 1949 car apparently was damaged at the scene of the shooting; one bullet pierced the windshield and another

struck and dented the left rear door. The police officers who, on the night of the crime, stopped the car, did not notice the damage to the windshield but did see the dented rear door. H. B. Sears admitted that on Saturday, June 10, he and Ketchel changed the windshield and that, a few days later, he painted the car with a white primer.

"Ketchel and H. B. Sears were arrested in Whittier on June 15, 1961. Ketchel voluntarily confessed his part in the crimes but H. B. Sears denied all involvement, maintaining that during the entire evening of June 9 he had been with his girl friend or with his brother Tommy, and had spent a good deal of the time at a bowling alley.

"Thomas Sears was apprehended in Phoenix, Arizona, and on June 17, 1961, three California police officers visited him in jail there. At that time he voluntarily made a confession setting forth in some detail the circumstances of the robbery and murder. He stated that H. B. Sears, Ketchel and he had decided on the afternoon of June 9, 1961, to rob a small market. They 'cased' the area near their apartment and finally selected the Star Market. H. B. Sears drove the car and about 8:30 p.m. parked on Alhambra Street near the market. Thomas Sears and Ketchel, both carrying guns, left the car, entered and robbed the market. While walking through the parking lot toward the alley leading into Alhambra Street, they heard the shots fired in their direction; they started running. In the fracas Thomas Sears saw Ketchel lean against a tree and thought he had been shot. Meanwhile Thomas Sears saw a bullet strike the waiting 1949 car, and, thinking that the man firing was trying to shoot his brother, H. B. Sears, in the car, Thomas Sears returned the gunfire, emptying his gun. Thomas Sears then entered the car with his brother H. B. Sears, and they drove from the scene, leaving Ketchel on his own in the street. Later the three met and divided the money (some $954).

"The Los Angeles police officers returned with Thomas Sears to Los Angeles. On June 18, 1961, Ketchel, Thomas Sears and H. B. Sears were brought together in a room of the Los Angeles Sheriff's substation. Three police officers interviewed them for about 20 minutes and then left them alone in the room. The three men discussed the crime; a tape recording was made of their conversation; one of the police officers heard their talk through a loud speaker which was part of the recording equipment. In the conversation, Ketchel said, 'I copped out to my part. I copped out to nothing else. They got me cold.' H. B. Sears then said, 'I've been holding out . . . I

didn't know what the hell this was all about. I been holding
out on account of you guys. I don't know what this is all
about.' Ketchel retorted, 'I'm dead . . . Somebody's going to
get gassed.' H. B. Sears replied, 'All right. You guys go on.
Sign your statement. Get gas. But I've been holding out be-
cause I don't know what's going on. They said you killed a
man. Well, I didn't kill nobody.' As the conversation pro-
gressed, Thomas Sears said, 'I know you didn't. I told them
the truth. I did it man.'

"At the trial H. B. Sears testified in his own defense. He
stated that in the evening of June 9, 1961, he arranged to
meet a couple of girls at a bowling alley. While he was driv-
ing there with his brother, they were stopped by the police
about 9:30 p.m., the car was searched, and after some 10
minutes checking they were released. Both then returned to
their apartment, left the car, and proceeded by taxi to the
bowling alley; since the girls did not come they returned
about midnight to their apartment." (59 Cal.2d at pp. 514-
517.)

The trial court instructed the jury that it could not con-
sider the confession of Thomas Sears in determining the guilt
or innocence of H. B. Sears. The jury returned a verdict
finding defendant and his codefendants guilty of first degree
murder and first degree robbery. This court affirmed the judg-
ment against defendant.

The Attorney General concedes that "in light of *Bruton* v.
*United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]
(1968), the use of Thomas Sears' confession without afford-
ing to petitioner the opportunity to cross-examine him, denied
to petitioner his federal constitutional right of confronta-
tion" and that *"Roberts* v. *Russell,* 392 U.S. 293 [20 L.Ed.2d
1100, 88 S.Ct. 1921] (1968), permits him to raise this question
notwithstanding the fact that his conviction became final in
1963." Nevertheless the state argues that the People have
proved "beyond a reasonable doubt" that the introduction of
defendant's brother's confession at their joint trial did not
contribute to the verdicts obtained against defendant (*Chap-
man* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705,
710, 87 S.Ct. 824]).

*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705,
87 S.Ct. 824], set the standard by which we must judge
whether the admission of Thomas Sears' confession consti-
tuted reversible error. In *Chapman* the court considered
whether a violation of the rule of *Griffin* v. *California,* 380

U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], forbidding comments on the silence of a defendant, could be harmless error, and, if so, whether the error was harmless in that case. The court declined to adopt a rule stating that "'all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful'" (386 U.S. at p. 21 [17 L.Ed.2d at p. 709]). Instead the court adopted the approach it had previously expressed in *Fahy* v. *Connecticut*, 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229] : " 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' . . . There is little, if any, difference between our statement in *Fahy* v. *State of Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt" (386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824]).

The Attorney General contends that the following evidence so conclusively pointed to defendant as the third member of the trio that it established defendant's guilt "beyond a reasonable doubt," and that as a consequence the introduction into evidence of defendant's brother's confession "did not contribute to" the verdicts against defendant.

1. *Evidence that three persons had committed the crime*

The dying police officer, in describing the robbery to a witness, said: "Three suspects in a '49 Ford." Eyewitnesses identified two of the robbers as Thomas Sears and Donald Ketchel, but no one identified the third person. The Attorney General argues that the evidence "persuasively" established the participation of three persons in the holdup. Yet the officer's statement that three persons were present at the scene in itself cannot possibly link defendant to the crime. The state's contention fails because of the lack of any proof at this point that defendant was the third person.

2. *Evidence that defendant drove the holdup vehicle after the robbery-murder*

The Attorney General contends that the testimony of police officers and the admission by defendant that he had been driving the holdup vehicle about 9:35 p.m. after the holdup when

the officers intercepted them, constitutes evidence that the defendant served as the third member of the trio. Defendant testified at the trial that he saw his brother driving Ketchel's car a little after 9 p.m., just after he finished making a phone call from a pay booth to his girl friend. His brother stopped the car; defendant entered, taking the driver's seat because he did not trust his younger brother's driving.

We cannot hold that the testimony placing defendant in the holdup vehicle more than one-half hour after the robbery-murder established beyond a reasonable doubt defendant's presence at, and participation in, the crimes. To the contrary, defendant's brother had ample opportunity within that period to discharge another person from the car, pick up the defendant, and cover the short distance to the place where the officers stopped them.

3. *Evidence concerning ownership of the holdup vehicle*

According to the information on the pink slip, defendant purchased the holdup vehicle from Ketchel on June 8, 1961. Defendant, however, on all occasions denied owning the car on that date, but rather stated he purchased in on Sunday, June 11, 1961, and changed the registration with the Department of Motor Vehicles on Monday, June 12, 1961. He stated that he placed the date June 8 on the pink slip as the date of purchase because that was the date that Ketchel, the seller, had inserted. At the time of defendant's arrest the officers failed to ask him the date of purchase. When the officers informed him that they were investigating the robbery and murder that had occurred on June 9, 1961, that three men had been involved, and that the 1949 Ford he owned had been used, defendant retorted, " 'Well, it wasn't me and it wasn't my car.' " He later stated in response to a question whether he had lent the car to anyone, " 'No. Nobody drives my car but me.' " At all times he denied ownership of the 1949 Ford on the date of the holdup.

The Attorney General argues that ''persuasive independent evidence established that petitioner had acquired ownership of the holdup vehicle the day before the crime.'' Such evidence, even if accurate, does not link defendant to the robbery-murder. Defendant at all times denied owning the car before June 11, 1961, and stated that the car belonged to Ketchel when he rode in it with his brother on June 9, 1961. Furthermore, even if defendant had owned the car on that date, that fact would not establish his presence at the holdup scene. Defendant

stated that his brother was driving the car when he met him after 9 p.m. that night.

4. *Repair of holdup vehicle*

Defendant admitted at the trial that on June 10, 1961, he helped Ketchel replace the windshield purchased by Ketchel for Ketchel's car; he did not, however, remove the old one and did not know who had done so. Defendant also admitted replacing the left rear door and repainting the vehicle prior to his arrest on June 15, 1961, but after he purchased the vehicle on June 11, 1961.

Despite the Attorney General's assertions to the contrary, the repair of the vehicle after the crime fails to establish defendant as the unidentified third person. At most, defendant's actions can be construed as knowledge on his part after commission of the crimes that the vehicle had been damaged during some sort of fracas.

5. *Taped conversation among three defendants on June 18, 1961*

On June 18, 1961, while the three defendants were in custody, sheriff's officers recorded a conversation among them which occurred when they were left alone in a room. The prosecution introduced parts of that conversation into evidence over the objection of all the defendants. The Attorney General cites the following portions of the conversation as implicating defendant: " 'H. B. Sears: "I've been holding out. I didn't know what the hell this was all about. I been holding out on account of you guys. I don't know what this is all about." Later defendant said: "All right. You guys go on. Sign your statement. Get gas. But I've been holding out because I don't know what's going on. They said you killed a man. Well, I didn't kill nobody." Thomas Sears answered: "I know you didn't. I told them the truth. I did it, man." ' "

Later in the same conversation Ketchel asked: " 'Are they going to allow us to make statements to the paper?' " Defendant answered: " 'You sure made a few.' " Ketchel: " 'Yeah. They're making a few theirselves.' " Defendant: " 'Tommy confessed? And, to the whole works, you confessed to the whole works, or something. I don't know. They generally say that you made the confession and Don, or Tommy made a confession in the papers, or something. Somebody's been doing a lot of talking.' "

Defendant denied any involvement or knowledge of what was going on throughout the conversation. His statement that he had been "holding out" and "holding out on account of

you guys," when taken with his continued protestations of innocence and lack of knowledge of what was going on, do not negate his innocence. Such statements are consistent with an intention not to confess to a crime he did not commit or not to give information as to his brother and Ketchel regarding anything he might have known of their involvement. When defendant's counsel objected to the introduction of portions of the conversation into evidence, the trial court indicated that it did not think defendant's statements constituted an admission or confession. Defendant's statements fail to furnish any substantial independent evidence that he was the third man in the holdup.

■ After reviewing the testimony cited by the Attorney General, we have concluded that the evidence submitted against defendant did not so conclusively establish his guilt that the introduction into evidence of his brother's confession did not contribute to the verdicts against him. Applying the standard of *Chapman,* we must conclude that the error in this case was not harmless to defendant.[1] We certainly cannot conclude that "Upon an examination of the entire record, we can conceive of no *reasonable* possibility that the error might have materially influenced any juror in arriving at the verdict in this case." (*People* v. *Modesto* (1967) 66 Cal.2d 695, 712 [59 Cal.Rptr. 124, 427 P.2d 788].) The only evidence which placed defendant at the scene of the holdup was the confession of his brother. Without that confession the record remains inconclusive; the jury reasonably could have believed defendant's testimony. None of the evidence cited by the

---

[1] The facts of this case clearly distinguish it from *Harrington* v. *California* (1969) 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726], a recent expression of the United States Supreme Court applying *Chapman.* There, three codefendants implicated Harrington in a robbery-murder through their extrajudicial confessions. One codefendant, who took the stand and was subjected to cross-examination, testified to Harrington's presence at the scene with a gun. Harrington himself admitted his presence at, and his flight from, the scene with the other defendants, but he denied having a gun. Several other prosecution witnesses also placed him at the scene.

The Court concluded that "the case against Harrington was so overwhelming that we conclude that this violation of *Bruton* was harmless beyond a reasonable doubt, . . ." (*Harrington* v. *California, supra,* 395 U.S. 250, 254 [23 L.Ed.2d 284, 287, 89 S.Ct. 1726].)

In the instant case the only evidence placing defendant at the scene of the crime was the two extrajudicial confessions of the codefendants. Neither codefendant took the stand so that defendant could cross-examine. At all times defendant denied his presence at the scene and his participation in the crime. *Harrington* does not apply here.

Attorney General, and heretofore discussed, proves beyond a reasonable doubt that Thomas Sears's confession did not contribute to the jury verdict finding defendant guilty of first degree murder and first degree robbery.

The Attorney General has not sustained the burden imposed by *Chapman* v. *California, supra,* 386 U.S. 18, to prove beyond a reasonable doubt that the introduction of Thomas Sears's confession in violation of *Bruton* v. *United States, supra,* 391 U.S. 123, did not contribute to the verdicts against defendant.

We grant the writ of habeas corpus, recall the remittitur as to H. B. Sears issued in *People* v. *Ketchel* (1963) 59 Cal.2d 503 [30 Cal.Rptr. 538, 381 P.2d 394], reverse the judgment of conviction as to him, and remand the cause for further proceedings in accordance with this decision.

Traynor, C. J., Peters, J., Burke, J., Sullivan, J., and Molinari, J., pro tem.,* concurred.

McCOMB, J.—I dissent. I would deny the application for habeas corpus.

---

*Assigned by the Chairman of the Judicial Council.