[Crim. No. 13743. In Bank. Dec. 23, 1969.]

In re TONY MONTOYA LARA on Habeas Corpus.

**COUNSEL**

Stephen V. Bomse, David M. Balabanian, William F. Johnson and Jerome B. Falk, Jr., for Petitioner.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Respondent.

## OPINION

MOSK, J.—This is a petition for habeas corpus by Tony Montoya Lara, confined under judgment of death after conviction of first degree murder, affirmed by this court. (*People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal. Rptr. 586, 432 P.2d 202].)

The petition presents three principal contentions. Two are directed to the guilt phase, and are without merit; the third, which invokes the rule of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], requires a new trial on the issue of penalty.

The facts are stated in detail in our prior opinion (67 Cal.2d at pp. 369-373), and may be briefly summarized here. Petitioner and his friend Alvarez, both in their late teens, inveigled Raymond Mitchell into giving them a ride in his car, then kidnaped him to obtain the vehicle for the purpose of committing armed robbery. After retrieving a shotgun that petitioner had secreted in a lumberyard, they forced Mitchell to drive the car to a deserted dump. There they beat him, removed his coat and shirt, tied his hands behind him, and threw him over the edge of the excavation. Petitioner and Alvarez each fired the shotgun into Mitchell's back, killing him. Failing to find a satisfactory place to rob, they abandoned Mitchell's car in a field.

Later that night petitioner called his girl friend and confessed that he and some others had forced a youth to take off his coat and shirt, had tied his hands behind his back, and had shot him and left him in the dump. On the following afternoon Alvarez confessed the shooting to one Meza, who had seen him and petitioner in the company of Mitchell shortly before the kidnaping. Petitioner also confessed to his sister that he was "in trouble" because he and others had tied up and shot the boy whose body had been found in the dump.

Petitioner and Alvarez were arrested two days after the murder, and were repeatedly advised of their constitutional rights. After failing to make a "deal" with the police, petitioner gave a full confession. When Alvarez was brought into the police station he was granted permission to confer privately with petitioner, and petitioner advised him to "tell them the truth." Alvarez then confessed, naming petitioner as his partner in crime. Both confessions were tape-recorded, reduced to writing, and introduced at the trial.

I

In our opinion (67 Cal.2d at pp. 392-393) we recognized that the admission of those portions of Alvarez' confession which implicated pe-

titioner constituted error under ·the then-controlling case of *People* v. *Aranda* (1965) 63 Cal.2d 518, 528-531 [47 Cal.Rptr. 353, 407 P.2d 265]. Again following *Aranda* (*id.* at p. 527), we judged the effect of this error by the California harmless-error standard. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Observing that "each defendant's case was shattered in any event by the impact of his own detailed confession, and the fact that each was also implicated by his codefendant's confession cannot realistically have contributed to either conviction," we held the error nonprejudicial. (Accord, *People* v. *Charles* (1967) 66 Cal.2d 330, 337, fn. 10 [57 Cal.Rptr. 745, 425 P.2d 545].)

Subsequent to the filing of our opinion in this case, the United States Supreme Court adopted the *Aranda* rule as constitutionally compelled by the confrontation clause of the Sixth Amendment (*Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]), and declared its decision to be fully retroactive (*Roberts* v. *Russell* (1968) 392 U.S. 293 [20 L.Ed. 2d 1100, 88 S.Ct. 1921]); by the same token, of course, the effect of such an error must now be judged by the federal harmless-error standard (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]).

Petitioner first contends that when we reweigh under *Chapman* the error in admitting the implicating portions of Alvarez' confession, we must find prejudice. The point is not well taken, as appears from a consideration of *In re Sears* (1969) 71 Cal.2d 379 [78 Cal.Rptr. 180, 455 P.2d 116], and *Harrington* v. *California* (1969) 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726]. In *Sears* we held a *Bruton* error to be prejudicial under *Chapman,* emphasizing that no evidence other than the codefendant's confession placed Sears at the scene of the crime. In *Harrington,* by contrast, the petitioner "made statements which fell short of a confession but which placed him at the scene of the crime. He admitted that Bosby was the trigger man, that he fled with the other three, and that after the murder he dyed his hair black and shaved off a mustache." (*Id.* at pp. 252-253.) The high court observed that while the codefendants' confessions placed Harrington at the scene of the crime, "others, including Harrington himself, did the same. Their evidence, supplied through their confessions, was of course cumulative. But apart from them the case against Harrington was so overwhelming that we conclude that this violation of *Bruton* was harmless beyond a reasonable doubt. . . ." (*Id.* at p. 254.) It was on this very ground that we distinguished *Harrington* in *Sears,* explaining that "In the instant case the only evidence placing defendant at the scene of the crime

was the two extrajudicial confessions of the codefendants. Neither co-defendant took the stand so that defendant could cross-examine. At all times defendant denied his presence at the scene and his participation in the crime. *Harrington* does not apply here." (71 Cal.2d at p. 387, fn. 1.)

In the case at bar, as in *Harrington*, the codefendant's confession was not the only evidence placing petitioner at the scene of the crime; rather, his own confession supplied that fact very convincingly. Petitioner seeks to distinguish *Harrington* on the ground that no issue was there raised as to the voluntariness of Harrington's confession, while here petitioner resisted the admission of his confession on the ground of alleged physical and psychological coercion. Petitioner argues that although the trial court found against him on this issue after a lengthy hearing, the jury might not have done so in the jury room and hence "might have totally (or even partially) ignored" his confession in deliberating on his guilt.

This is, of course, mere speculation, going far beyond the hypothetical case of prejudice we envisaged in our opinion.[1] In any event, the fact remains that petitioner's confession to the police was not the only confession of his admitted at trial: both his girl friend and his sister also testified to spontaneous, unsolicited confessions he made to them shortly after the crimes, and there can be no possible claim of coercion as to those statements. It follows that the case is controlled by *Harrington*, and that no perjudice is shown under the *Chapman* rule as it is there applied.

## II

■ The leads developed in the police investigation of these crimes took the arresting officers to the house of petitioner's sister. As we recited in our opinion (67 Cal.2d at p. 371), "She answered the door, identified herself as Lara's sister, and let the officer into the living room. He asked if Lara was there, and requested permission to search the premises. Permission was denied, but the officer heard a thumping noise from an adjacent bathroom. Lara then appeared from the hallway and said, 'Are you looking for me?' After Lara identified himself he was placed under arrest on the

---

[1]"We do not mean to imply that a violation of the *Aranda* [or *Bruton*] rules will be automatically nonprejudicial as to any defendant who has made a confession of his own. In every such case the issue remains whether the effect of any circumstances which might otherwise have mitigated the impact of the defendant's confession was overcome by the portions of a codefendant's statement implicating the defendant; in that event, the implication would be prejudicial despite the defendant's own confession. Such a situation might occur, for example, when the confessing defendant presented evidence to show his statement was not freely given, *and also denied its truth on the witness stand*. In the case before us, however, Lara made no such denial; on the contrary, he admitted he told the police the whole story of what had happened on the night of the killing." (Italics added.) (67 Cal.2d at p. 393.)

charge of murder. The officer then looked in the bathroom and found a 12-gauge shotgun." Ballistics tests established it was the murder weapon.

In rejecting a contention that the gun was obtained by illegal search and seizure, we held the arrest was lawful and "The search was clearly incident to the arrest of Lara, and hence was not 'unreasonable' within the meaning of the Fourth Amendment" (67 Cal.2d at p. 373).

Subsequent to our decision the United States Supreme Court decided *Chimel* v. *California* (1969) 395 U.S. 752, 763 [23 L.Ed.2d 685, 694, 89 S.Ct. 2034], restricting warrantless searches incident to an arrest to "the area into which an arrestee might reach in order to grab a weapon or evidentiary items. . . ." In *People* v. *Edwards* (1969) 71 Cal.2d 1096, 1106-1110 [80 Cal.Rptr. 633, 458 P.2d 713], however, we declared the *Chimel* rule to be prospective in operation, applying only to cases in which the search took place after the date of *Chimel* (June 23, 1969). In the case at bar, the search now challenged occurred more than four years prior to *Chimel*.

Nevertheless petitioner urges that a special exception should be carved out in capital cases, i.e., that *Chimel* should be applied retroactively whenever the judgment decrees the death penalty. In support, petitioner stresses the limited number of defendants who could take advantage of such a ruling, and the gravity and finality of the penalty. But the number of defendants involved is relevant only to the effect on the administration of justice; other criteria bearing on the question of retroactivity—i.e., the integrity of the fact-finding process, the purpose of the new rule, and the reliance by law-enforcement authorities on the old rule—are unaffected by either the number of the defendants or the nature of their punishment. Nor does the Supreme Court appear to believe such an exception is constitutionally compelled: both *Johnson* v. *New Jersey* (1966) 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 772], and *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967], for example, were capital cases in which a new constitutional doctrine was denied retroactive effect. Finally, there is no merit to petitioner's argument that refusal to apply the *Chimel* rule to him and other condemned men will result in "cruel and unusual punishment" in violation of the Eighth Amendment.

### III

■ During the *voir dire* of prospective jurors 11 veniremen were excused for cause by reason of their views on the subject of capital punishment. Of these, at least seven were stricken in violation of the rule of *Witherspoon*

*v. Illinois* (1968) *supra,* 391 U.S. 510. The trial, we recognize, was held more than two years before *Witherspoon.*

Upon being examined by defense counsel, veniremen Remy, Shirley M. Brown,[2] Cruz, Burgess, Majors, Maxwell, and Morrison each expressed general opposition to capital punishment. When the prosecuting attorney took over the questioning, he announced somewhat briskly that "We will take each one [i.e., each venireman] and go down the line and clear the air so we don't have to waste time."[3] As good as his word, he briefly inquired of each venireman whether he or she could impose the death penalty "in a proper case." A typical question was, "Mrs. Remy, in a proper case, where all the essential elements are present and where the facts do justify it, could you bring in a death penalty, or would your feelings against the death penalty prohibit you from doing so?" Mrs. Remy replied that she "believed" she could not return such a verdict "in a proper case." The prosecutor moved on to her fellow veniremen, and quickly dispatched five more with the same question.[4] At the conclusion of this "examination," the prosecutor successfully challenged each of the above named veniremen "because the juror expressed an inability to bring in a penalty of death in

---

[2]The panel included two Mrs. Browns (May A. Brown and Shirley M. Brown), who were occasionally questioned without mention of their given names. In each instance, however, a fair reading of the context indicates which Mrs. Brown was speaking at the time.

[3]This remark is unfortunately reminiscent of the Supreme Court's observation in *Witherspoon* that "In the present case the tone was set when the trial judge said early in the *voir dire,* 'Let's get these conscientious objectors out of the way, without wasting any time on them.' " (391 U.S. at p. 514 [20 L.Ed.2d at p. 780].)

[4]In the course of asking each venireman the question, "In a proper case could you bring in the death penalty?" the prosecutor elicited the following responses:

"MR. FELDMAN: Mrs. [Shirley M.] Brown, you have said No, so I assumed your answer is still the same. A. I could not.

"Q. You would not find them guilty if it meant their life, so you could not bring in the death penalty? A. Not for the death penalty, if that was it.

"Q. All right, I understand. Mrs. Cruz, what about you? A. After the Judge explained it, I would not be able to turn in the death penalty.

"Q. Mrs. Burgess? A. The same answer.

"Q. You could not bring in the death penalty? A. No, I could not.

"Q. And Mrs. Majors? A. I don't believe I could.

"Q. And you would not in a proper case, you could not? A. I could life imprisonment, but never take his life.

"Q. The jury does not invoke the death penalty. They just make the finding and the Court does the rest. . . .

"THE COURT: The mechanical pronouncing of sentence is left to the Court, but the determination of which sentence shall be imposed is within the discretion of the jury, in the event of the finding of guilty of either of the two crimes. Do I make myself clear? A. Yes.

"MR. FELDMAN: For the record, you could not? A. That is correct.

"Q. Mr. Maxwell, your answer is that you could not in the proper case bring in a verdict of the death penalty? A. That is correct."

Similar questioning was the basis for the subsequent challenge to Mrs. Morrison.

a proper case, should the occasion arise that she has to make such a consideration."

The foregoing record brings this case clearly within the ambit of such recent decisions as *People* v. *Williams* (1969) 71 Cal.2d 614 [79 Cal. Rptr. 65, 456 P.2d 633], *People* v. *Ketchel* (1969) 71 Cal.2d 635 [79 Cal.Rptr. 92, 456 P.2d 660], and *In re Hillery* (1969) 71 Cal.2d 857 [79 Cal.Rptr. 733, 457 P.2d 565], in which the use of the "proper case" question, without more, was held to violate *Witherspoon*. As required by *People* v. *Varnum* (1969) 70 Cal.2d 480, 492-493 [75 Cal.Rptr. 161, 450 P.2d 553], we have considered the offending words in the context of the entire *voir dire;* but in distinction to *Varnum,* the record shows that the "proper case" questions here were neither (1) preceded by an explanation that the issue was to be determined by the subjective judgment of each individual juror, nor (2) qualified by such language as "under no circumstances" or "in no event," etc. Accordingly, a new penalty trial is required pursuant to the mandate of *Witherspoon* and the above cited cases. (See also *People* v. *Teale* (1969) 70 Cal.2d 497, 512-519 [75 Cal.Rptr. 172, 450 P.2d 564].)

Other contentions advanced by petitioner have been rejected by us in *In re Anderson* (1968) 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117], and *In re Arguello* (1969) 71 Cal.2d 13 [76 Cal.Rptr. 633, 452 P.2d 921].

The writ is granted as to the penalty trial. The remittitur issued in *People* v. *Lara,* Crim. 10061, is recalled and the judgment imposing the death penalty is reversed insofar as it relates to penalty. In all other respects the judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., and Sullivan, J., concurred.

**BURKE, J.**—I dissent from the reversal of the judgment with respect to penalty and concur in the affirmance of the judgment in all other respects.

The majority hold that a new penalty trial is required pursuant to the mandate of *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], on the ground that the "proper case" questions to the prospective jurors "were neither (1) preceded by an explanation that the issue was to be determined by the subjective judgment of each individual

juror, nor (2) qualified by such language as 'under no circumstances' or 'in no event,' etc." (*Ante,* p. 493.)

I cannot agree with the foregoing conclusion, for on reviewing the jurors' responses in the context of the entire *voir dire* (*People* v. *Varnum,* 70 Cal.2d 480, 492-493 [75 Cal.Rptr. 161, 450 P.2d 553]), it is apparent to me that the jurors were adequately instructed regarding the extent of their discretion to impose death or life imprisonment, and that each juror made it unmistakably clear that he or she would, under no circumstances, impose the death penalty.

Shortly before the prosecution commenced its *voir dire* examination, the court instructed the first panel of jurors (which included jurors Remy, Shirley M. Brown, Cruz, Burgess, Majors and Maxwell) that the matter of penalty is solely within the discretion of the jury; that the law does not require the jury to find one way or another; and that no instructions would be given the jury requiring them to impose the death penalty, or life imprisonment, if certain facts are found to be true.

Thereafter, the prosecutor preceded his questioning of individual jurors by explaining that the state was seeking the death penalty; that the matter of punishment is left in the "unfettered discretion" of the jury; that no law governs that discretion; and that "It is your own *personal* feeling as to what should be done." (Italics added.)

Thereupon, the prosecutor commenced to ask various members of the jury if, having "unfettered discretion," he or she could impose the death penalty "in a proper case" or "where the facts justify it." Mrs. Remy answered that she believed she could not impose death in a proper case. Mrs. Shirley M. Brown replied, "I could not. . . . Not for the death penalty, if that was it." Mrs. Cruz responded, "After the Judge explained it, I would not be able to turn in the death penalty." Mrs. Burgess stated, 'The same answer [as juror Cruz]. . . . No, I could not." Mrs. Majors replied, "I could life imprisonment, but never take his life." Mr. Maxwell stated, "That is correct," when asked if he could not impose death in a proper case. Mrs. Morrison, from a second panel of jurors, after being told that the choice of penalty was left to her own "personal discretion" stated that she could not impose death.

All of the foregoing responses were made immediately following the court's instructions and the prosecutor's statements to the effect that the jurors had sole and unfettered discretion whether to impose death, and that their own personal feelings, and not the law, must govern their decision.

Consequently, I fail to see how these jurors could possibly have been misled by the "proper case" terminology used on *voir dire*. By affirming that they would be unable to impose the death penalty even if they felt, in their sole, unfettered and personal discretion,[1] that a proper case for death was presented, these jurors made it unmistakably clear that under no circumstances would they vote for death. That being so, their responses clearly satisfied the *Witherspoon* test.

McComb, J., concurred.

---

[1] In *Williams, Ketchel* and *Hillary*, relied upon by the majority, the excluded jurors were never informed that the choice of penalty was left to their own unfettered and personal discretion.