[Crim. No. 14977. In Bank. Aug. 16, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
LAVADA CAROLE KING, Defendant and Apellant.

**COUNSEL**

Albert D. Silverman, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, and John H. Darlington, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

McCOMB, J.—Defendant was charged by information with having had in her possession for sale a restricted dangerous drug, in violation of section 11911 of the Health and Safety Code. After denial of her motion under section 1538.5 of the Penal Code to suppress certain evidence, she waived trial by jury and stipulated that the case be submitted on the transcript of the preliminary hearing and the testimony taken at the hearing on the motion under section 1538.5 of the Penal Code. She was found guilty of the lesser included offense of possession of dangerous drugs (Health & Saf. Code, § 11910) and appeals from the judgment of conviction (order granting probation).

*Facts*[1]: On the evening of January 28, 1969, Los Angeles Deputy Sheriff Carl F. Lambe was working the warrant detail in the East Los Angeles station's detective bureau. About 6 p.m., he was given a photograph of Ernest Gifford, a suspect wanted for failure to pay a fine on a petty theft charge. The photograph, which was given to Deputy Lambe by Deputy Butts of the East Los Angeles station's narcotics detail, contained a description of Gifford as being 6 feet tall and weighing 245 pounds. Deputy Butts told Deputy Lambe that a possible bench warrant was out for Gifford's arrest.

About 6:15 p.m., Deputy Butts told Deputy Lambe that Gifford was living with defendant at 7735 Walker Street, Apartment D, Cudahy. Deputy Butts also told Deputy Lambe that defendant had been selling dangerous drugs and that he had observed a sale of dangerous drugs by her at the above apartment. In addition, he told Deputy Lambe that he had information from a reliable informant that defendant kept a large amount of dangerous drugs under her bed in her bedroom and that she had made numerous sales to many people. Deputy Lambe had known Deputy Butts for several years.

About 11 p.m., Deputy Lambe verified from an operator in the central warrant files office that a felony warrant, issued by department 100, was out for Gifford and that he had prior felony arrests. Deputy Lambe and four other deputies thereafter proceeded to the apartment, arriving about 11:45 p.m. Five deputies were sent, in order to avoid complications on the arrest.[2] After knocking on the apartment door, the deputies identified themselves. When Gifford opened the door, they arrested him. Since it was a chilly evening, they all went into the living room. (Admittedly, the entry into the living room and Gifford's arrest were lawful.)

Deputy Lambe then asked Gifford if defendant was in the apartment. Gifford said that she was. When asked where, he replied, "In the rear bedroom." Deputies Lambe and Barseck went to the rear bedroom, opened the closed door, and turned on the light. Defendant was lying on the bed under the covers. Deputy Lambe asked if she was Lavada King. She gave an affirmative answer and threw off the covers. The deputies observed that she was fully dressed in normal street clothes. Defendant continued to lie

---

[1]The facts will be stated in accordance with the well-settled rule that an appellate court must view the evidence in the light most favorable to the judgment. (See *People* v. *Redmond,* 71 Cal.2d 745, 755 [1] [79 Cal.Rptr. 529, 457 P.2d 321].)

[2]It will be recalled that Gifford was 6 feet tall, weighed 245 pounds, and had a record of prior felony arrests.

In accordance with their usual practice, one of the deputies remained outside at the corner of the building, so that if the arrestee tried to escape out of a window, the exit would be covered.

on the bed. Deputy Lambe then advised her that they had already arrested Gifford under a felony warrant and that they had certain information with respect to narcotic activities in her apartment and had been informed that she was involved in the activities and kept a large amount of dangerous drugs under the bed.

At this point, Deputy Williams, who had remained in the living room with Gifford, approached Deputy Lambe and informed him that a benzedrine tablet had been found in the living room. (The tablet was discovered by accident, when the deputy, at Gifford's request, opened a cardboard box on the table in the living room to locate Gifford's probation papers.) Deputy Lambe then directed defendant to remove herself from the bed; and, without having to move any bedding or clothing, he looked under the bed with his flashlight and saw a brown paper sack. The sack was open, and Deputy Lambe observed a small piece of cellophane sticking out of it. As a qualified expert on the packaging and use of benzedrine, he believed that the bag might contain dangerous drugs. He thereupon removed the bag and discovered that it contained 400 benzedrine tablets in plastic bags, 50 tablets to a bag. He then placed defendant under arrest and advised her of her constitutional rights. After stating that she did not desire an attorney before discussing the matter, defendant admitted selling the drugs for "a little extra money." She said that she took 50 to 100 tablets a day herself, and she gave other details.

██ *Questions*: First. *Did the deputies have probable cause to arrest defendant prior to looking under her bed?*

*Yes.* Before looking under the bed, Deputy Lambe had the information given to him by Deputy Butts and also information that a benzedrine tablet had been found in the living room. These facts together clearly constituted probable cause to arrest. (See *People* v. *Ingle,* 53 Cal.2d 407, 412-414 [2 Cal.Rptr. 14, 348 P.2d 577].)

It is true that part of the information given to Deputy Lambe by Deputy Butts consisted of information from an undisclosed informant whose reliability had not been developed. However, the informant's information was merely secondary. Deputy Butts told Deputy Lambe that he himself—and his reliability was obvious—had actually seen defendant sell benzedrine in the apartment. As a result, reliability and the source of the information, with respect to what Deputy Butts reported he had witnessed, were shown. Furthermore, the information regarding Deputy Butts' having personally seen a sale of drugs by defendant may be considered as corroborative of the information given to Deputy Butts by the unidentified informant and re-

layed by Deputy Butts to Deputy Lambe. (See *People* v. *Sandoval,* 65 Cal. 2d 303, 308-310 [54 Cal.Rptr. 123, 419 P.2d 187]; *People* v. *Marquez,* 259 Cal.App.2d 593, 598-600 [66 Cal.Rptr. 615].) It should also be noted that defendant's furtive conduct in going to bed fully dressed in street clothes and pretending to be asleep constituted additional corroboration. Under the circumstances, this is not a case where an arrest was made on the basis of hearsay on hearsay, such as occurred in *People* v. *Pease,* 242 Cal.App.2d 442 [51 Cal.Rptr. 448].

■ The arrest having been lawfully made, the deputies could properly search under defendant's bed, such area, as will hereinafter appear, being within the permissible scope; and it is immaterial that the search preceded, rather than followed, the arrest. (*People* v. *Torres,* 56 Cal.2d 864, 866 [1] [17 Cal.Rptr. 495, 366 P.2d 823]; *People* v. *Ingle, supra,* 53 Cal.2d 407, 413 [4].)

Second. *Was the scope of the search permissible?*

*Yes.* This court has decided that the rule laid down in *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], limiting the scope of a search incident to an arrest, is applicable only prospectively. (*In re Lara,* 1 Cal.3d 486, 491 [82 Cal.Rptr. 628, 462 P.2d 380]; *People* v. *Edwards,* 71 Cal.2d 1096, 1106-1110 [80 Cal.Rptr. 633, 458 P.2d 713].) Accordingly, since *Chimel* was decided June 23, 1969, and the search in the present case occurred prior to that time, the limitations imposed by *Chimel* are not here applicable.

Even under the restrictions therein imposed, however, the officers' search did not exceed the permissible scope. Thus, in *Chimel* it was said at page 763 [23 L.Ed.2d at p. 694]: "[I]t is entirely reasonable for the arresting officer to search for and seize any evidence . . . [within] the area into which an arrestee might reach in order to grab . . . evidentiary items . . . ." Clearly, when defendant was sitting on the bed, the area under it was within "the area into which [she] might [have] reach[ed] in order to grab . . . evidentiary items."

■ Third. *Is defendant entitled to have the seized evidence suppressed on the ground that the deputies, before breaking the door to her bedroom, failed to identify themselves and announce their purpose in entering?*

*No.* Under section 844 of the Penal Code, an officer may, to make an arrest, break open the door of the house in which the person to be arrested is "after having demanded admittance and explained the purpose for which admittance is desired." Section 1531 of the Penal Code, relating to the execution of search warrants, authorizes the officer to break open any "outer

or inner door . . . of a house . . . to execute the warrant, if, after notice of his authority and purpose, he is refused admittance."

In the present case, the deputies did not have a search wararnt and did not enter defendant's bedroom for the purpose of arresting her. Deputy Lambe testified that he went to defendant's apartment to arrest Gifford and that he "also planned on conducting a narcotics investigation if the opportunity presented itself." ■ However, the requirements for forcing entry to make an investigation should be no less stringent than they are where entry is made under a search warrant or for the purpose of arresting someone.[3]

■ No contention is made that the deputies failed to observe the statutory notice requirements with respect to their entry through the front door to the apartment. It is clear, however, that they broke open the door to defendant's bedroom without having identified themselves or announced the purpose of their entry.

Defendant contends that the deputies had no right to break open the door to her bedroom without observing the statutory notice requirements even though they were legally in the apartment; that, as a result, their entry into her bedroom was illegal; and that the seized evidence should therefore be suppressed.

Whether or not the deputies, although legally in the apartment, were required to identify themselves and announce the purpose of their entry before breaking the door to defendant's bedroom, defendant has not timely raised the point. This court as long ago as 1967 made it clear that forcible entry to execute a warrant cannot be justified on the blanket basis of the type of crime or evidence involved, such as narcotics cases or other cases involving easily disposable evidence (*People* v. *Gastelo,* 67 Cal.2d 586, 588-589 [63 Cal.Rptr. 10, 432 P.2d 706]); and it is now settled that a defendant, in a case where evidence was allegedly seized by officers who entered without giving proper notice, may raise the point for the first time on appeal only where his trial took place prior to our decision in *Gastelo* (*People* v. *Hamilton,* 71 Cal.2d 176, 178 [1] [77 Cal.Rptr. 785, 454 P.2d

---

[3]As stated by this court in *Duke* v. *Superior Court,* 1 Cal.3d 314, 321 (3) [82 Cal. Rptr. 348, 461 P.2d 628]: "The purposes and policies underlying section 844 are fourfold: (1) the protection of the privacy of the individual in his home [citations]; (2) the protection of innocent persons who may also be present on the premises where an arrest is made [citation]; (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice [citations]; and (4) the protection of police who might be injured by a startled and fearful householder." Although there is no statutory requirement with respect thereto, it would appear that the same policy should govern in cases where entry is sought for the purpose of investigating possible criminal offenses.

681]; *People* v. *De Santiago,* 71 Cal.2d 18 [76 Cal.Rptr. 809, 453 P.2d 353]). Before that time, as pointed out in *De Santiago,* competent and knowledgeable members of the legal profession would have reasonably concluded that an objection on such ground at the trial would have been futile. Defendant's trial, however, took place in May 1969, long after our decision in *Gastelo,* as a result of which she is not entitled to raise the point for the first time on appeal.

The judgment is affirmed.

Wright, C. J., Mosk, J., and Burke, J., concurred.

**PETERS, J.**—I dissent. The testimony of the officer reveals that he did not arrest on the basis of the circumstances relied upon by the majority to establish probable cause. To the contrary, it is apparent from his testimony that he did not intend to arrest until his search disclosed the drugs under Lavada King's bed. In these circumstances the search was not *incident* to the arrest but was *the cause* of the arrest, and the officer should not be permitted to justify the search and the arrest on the basis of information which he obviously did not consider to justify the arrest and which did not furnish the basis for his actions. We so held upon closely analogous facts (*In re Martinez,* 1 Cal.3d 641, 646 [83 Cal.Rptr. 382, 463 P.2d 734]; *People* v. *Gallegos,* 62 Cal.2d 176, 178 [41 Cal.Rptr. 590, 397 P.2d 174]; see also *People* v. *Hunt,* 250 Cal.App.2d 311, 315 [58 Cal.Rptr. 385]) and the majority in upholding the arrest on the basis of information upon which the officer did not rely undermines the rule excluding evidence obtained in violation of the Fourth Amendment and repudiates these cases without mentioning them.

The majority fails to point out what Deputy Lambe's testimony makes clear: The officers went to the apartment not to arrest defendant but to conduct a "narcotics investigation." In the process of "investigating," they searched under her bed and upon discovering contraband, arrested her. Since neither the information obtained from Deputy Butts nor the pill found in the living room[1] induced her arrest the only cause that remains is the discovery of contraband beneath her bed. It is apparent that from the first Gifford's arrest was seen by the officers as an opportunity to get into Lavada King's apartment to search for the contraband they believed might be there and if they found it, to arrest her.

They chose not to test the sufficiency of their cause to arrest or search, which the majority finds so convincing, by seeking a search or arrest

---

[1]"Q. You did not place her under arrest for possession of the pill that Mr. Williams said that he had found in the living room did you? [¶] A. No, I did not."

warrant from a magistrate. Had they done so, they would, of course, have been forced to submit to the protective rigors of specificity and the disinterested eye of the magistrate. They would have been required to establish the time, date, occasion and circumstances of the purchase of contraband from Mrs. King and the reliability of the source of the information that she kept drugs under her bed. The only conclusion I can draw from their failure to obtain a warrant and the officer's testimony concerning his intent and purposes in going to the apartment is that the officers *themselves* did not believe they had probable cause to arrest Mrs. King or obtain a search warrant.

The officer's self-described conduct violates established rules of search and seizure. Unless the officers entered defendant's room and conducted their search incident to an arrest on probable cause, the warrantless search was impermissible and its fruits inadmissible. (See, e.g., *Agnello* v. *United States,* 269 U.S. 20 [70 L.Ed. 145, 46 S.Ct. 4]; *People* v. *Shelton,* 60 Cal.2d 740, 744 [36 Cal.Rptr. 433, 388 P.2d 665].) General exploratory searches designed to uncover contraband, *even where officers have information as to its existence,* are not permitted. (*Chimel* v. *California,* 395 U.S. 752, 762 [23 L.Ed.2d 685, 694-695, 89 S.Ct. 2034]; *Chapman* v. *United States,* 365 U.S. 610, 614-615 [5 L.Ed.2d 828, 832-833, 81 S.Ct. 776].) Nor may an arrest be used as a pretext for a search. (*People* v. *Haven,* 59 Cal.2d 713, 719-720 [31 Cal.Rptr. 47, 381 P.2d 927]; *People* v. *Mills,* 148 Cal.App.2d 392, 401 [306 P.2d 1005].) Much less are officers permitted to enter a bedroom unbidden, particularly in the middle of the night, to "investigate." (*People* v. *Shelton, supra,* 60 Cal.2d 740, 746-747.)

The majority would permit such searches as long as some justification not contemplated by the officers can be made for them in court. I believe that this rule is contrary both to the policies underlying the exclusionary rule and California case law. I would hold the officers to their own description of their acts and invalidate the search.

The courts adopted the exclusionary rule in significant part to eliminate the incentive for law enforcement officers to obtain evidence for conviction by unlawful searches and arrests. As we said in *People* v. *Cahan,* 44 Cal.2d 434, 439 [282 P.2d 905, 50 A.L.R.2d 513], "[I]t bears emphasis that the court is not concerned solely with the rights of the defendant before it, however guilty he may appear, but with the constitutional right of all of the people to be secure in their homes, persons, and effects." Consequently, the exclusionary rule is "calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive

to disregard it." (*Elkins* v. *United States,* 364 U.S. 206, 217 [4 L.Ed.2d 1669, 1677, 80 S.Ct. 1437].)

If the exclusionary rule is to be an effective means of controlling future police conduct, an officer's own characterizations of his purposes and acts in carrying out a search is a critical factor. Today's holding rewards a gamble. If the officer's otherwise unlawful "investigation" yields contraband, he makes an arrest, and if the prosecuting attorney can unearth probable cause for arrest, he sees his labors rewarded. If the investigation yields nothing, he is free to search and leave, to return another day. This type of investigation and search for the purpose of finding evidence of crimes is precisely the kind of invasion into the privacy of the home the Fourth Amendment was designed to prevent. The majority's holding, by permitting law enforcement officers to profit from their unconstitutional motivations, increases the probability of future unlawful searches.

Conversely, by *excluding* evidence so obtained, we encourage law enforcement officers to know and heed the limits of the Fourth Amendment. Moreover, we encourage the use of warrants for search and arrest, our greatest protection against illegal intrusions upon persons, houses, papers and effects of the people. (See, e.g., *Chimel* v. *California, supra,* 395 U.S. 752, 761 [23 L.Ed.2d 685, 692-693]; *Terry* v. *Ohio,* 392 U.S. 1, 12-13 [20 L.Ed.2d 889, 900-901, 88 S.Ct. 1868]; *Chapman* v. *United States, supra,* 365 U.S. 610, 614-615; *People* v. *Castro,* 249 Cal. App.2d 168, 175 [57 Cal.Rptr. 108].)

This court has declared searches invalid in cases closely analogous to the instant one. In *People* v. *Gallegos, supra,* 62 Cal.2d 176, the police conducted a search without probable cause. Because it later appeared that the defendant was a parolee, the prosecution sought to justify the search on the ground that a parolee's home may be searched prior to an arrest. We said: "Although under ordinary circumstances a parolee's place of residence may be searched prior to an arrest [citations], in the instant case *the status of the defendant as a parolee was not relied upon by the arresting officer. Hence,* lacking evidence in this regard, *the search* of defendant's premises which immediately followed the arrest, and the results thereof, *could not be utilized in justification of the arrest."* (*Id.* at p. 178; italics added.) A recent case, *In re Martinez, supra,* 1 Cal.3d 641, 646, reaffirms the principle set forth in *Gallegos* on virtually identical facts. (See also *People* v. *Hunt, supra,* 250 Cal.App.2d 311, 315.)

In this case, as in *Gallegos* and *Martinez,* the police did not act upon information which would have justified their otherwise illegal search. Since the officers did not rely, in making the arrest, on the information

supplied by Deputy Butts, but rather on the contraband discovered under defendant's bed, the rule of *Gallegos* and *Martinez* governs here.

*People* v. *Chimel*, 68 Cal.2d 436 [67 Cal.Rptr. 421, 439 P.2d 333], in which this court held an invalid warrant does not render a search unlawful where there is probable cause is distinguishable. (See also *People* v. *Castro, supra*, 249 Cal.App.2d 168, 174-175.) The policy reasons for upholding the search in that case are the very reasons for invalidating it here. This court said, " *'First*: Although certain nonwarrant arrests and searches are permissible, the policy of the law is to encourage officers to use search warrants. . . . *Second*: The rule which excludes evidence obtained by illegal searches was adopted [partially] for the purpose of eliminating the incentive for police officers to use illegal methods. [Citations.] . . . That principle does not call for a rejection of the evidence in this case. Here the officer was guilty of no wrongdoing except faulty draftsmanship. . . .' . . . *To invalidate the arrest* here *solely* because the arresting officer first obtained a warrant supported by a constitutionally insufficient complaint *would not further the policies of the Fourth Amendment but would subvert its preference for arrests and searches conducted pursuant to warrants.*" (*Id.* at pp. 441-442; italics added.)

The justification for the majority holding in *Chimel* certainly does not exist in our case. To permit the introduction of the evidence obtained in the search in the instant case would reward officers for not obtaining warrants and would dilute the deterrent effect of the exclusionary rule.

There is an additional point on which I must take issue with the majority. While I am willing to concede that the scope of the search (assuming lawful arrest) was not overbroad by pre-*Chimel* standards, I cannot agree with the dicta suggesting that the search would be upheld after *Chimel*. The record reveals nothing about the size of the bed or the location of the paper bag beneath it. Unless the bag was within the defendant's reach, the requirements of *Chimel* are not satisfied. I do not believe that this court should rush in and declare that items under beds, without more, are lawful objects of a search under *Chimel*.

I would reverse the judgment.

Tobriner, J., and Sullivan, J., concurred.