[Crim. No. 10767. First Dist., Div. One. Sept. 5, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS DALE EPPS, Defendant and Appellant.

148

## COUNSEL

Francis L. Wood, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Derald E. Granberg and April P. Kestell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, J.**—Appellant has appealed from a judgment of conviction which, subject to the provisions of Penal Code section 1168, sentenced him to state prison following jury verdicts that found him and a codefendant each guilty of burglary in the second degree. He contends: (1) that in violation of principles set down in *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], he was denied due process of law and confrontation of witnesses because his codefendant's out-of-court statement implicating him was admitted in evidence at a trial where his codefendant did not take the stand; (2) that insofar as his separately appointed counsel failed to raise the foregoing objection at trial, he was denied the effective assistance of counsel; and (3) that the instructions given by the trial court were contradictory, confusing and misleading to the jury and contained a misstatement of the law.

Appellant's contentions must be viewed within the framework of the following facts which were established by evidence in the record.

On March 27, 1971, at approximately 2:17 a.m. a burglary report came in to the Berkeley Police Department for the Bryant Laboratories, a company which stores and distributes some three or four thousand chemicals to pharmacies, hospitals and manufacturing laboratories. Officer Joseph Sanchez, testified that he was already cruising in the area on patrol, and arrived at the scene within seconds of the call. Before arriving, he had turned off his car lights when about three blocks away, however, he emphasized that the building involved and surrounding area were extremely well lighted.

As he drove up approximately one-half block away from the laboratory, he saw a 1963 green Pontiac Grand Prix with its hood up in a vacant lot next to the laboratory warehouse and one man standing near the hood.

As Sanchez entered the lighted intersection, the man at the hood looked up at him. He then turned his head towards the laboratory, and Sanchez heard a voice, seemingly coming from the area of the car, utter indistinguishable words in a manner similar to a shout.

At this point a man peered out from the laboratory door, whereupon Sanchez accelerated toward the vicinity of the Pontiac, exited his car with a shotgun, and ordered the men into plain view. The suspect in the doorway went back into the building and Sanchez told him again to come into view. The man at the car, whom Sanchez identified as appellant Epps, also did not halt, but proceeded toward the hood of the car as if to close it, then stopped upon a second command. The man in the doorway, identified as codefendant Freeland, came out of the building but proceeded behind a van parked near the door, whereupon Officer Sanchez shouted that if he did not come out, the officer would assume he was armed and open fire. Freeland then came out into the open and Sanchez kept both of them covered until Officers Wright and Emberton arrived to assist.

Officer Emberton testified that within two minutes of his arrival, he asked Epps to whom the green car belonged.[1] Epps replied that it was his, although he then produced a registration listing the car to a female with the last name of Epps. Freeland was also questioned, but since Epps is challenging the admission of what Freeland said, the content of Freeland's statements will be set forth below.

Both defendants were transported to jail, then the officers called the president of Bryant Laboratories, and he proceeded to examine the building about 3:30 or 4 a.m. to see if anything had been taken. He noticed that two doors, which had been locked when he left the night before, had been forced open, one by jimmying the lock and the other by kicking in the door's lower panel. He also noticed that lights which had been off when he closed the building that night were on.

The various officers testified that at one doorway there were muddy footprints with an imprinted design similar to that made by the muddy boots Freeland was wearing that night. Also, some boxes were found near one door, and several were scattered on the floor of a storage room which had other boxes neatly stacked on shelves. A pat search of Freeland disclosed a screwdriver, and a search of the car produced a book entitled "Medical and Public Health Laboratory Methods."

---

[1]This testimony was objected to on the grounds it had been elicited when Epps was in custody but had not been given his *Miranda* warnings. The court took the position that appellant was not yet in custody, as Sanchez had pulled his gun only to protect himself, and the police had the right to ask certain preliminary questions of the men before giving them their *Miranda* warnings.

The motive for this burglary was supplied by testimony concerning several prior incidents involving appellant Epps. Agent George Garrison of the State Bureau of Narcotics testified that in December of 1970 he had asked one of his contacts from whom she could "score" and she mentioned Epps, among others. Consequently, on December 17, the agent and contact went to Woodland, and asked Epps for an ounce of speed. He said he could not deliver any speed right then since he wasn't "cooking." He said he had all the glassware and chemicals except the chemical phenyl-2.[2]

Also in January of 1971, Thomas Gorman, another narcotics agent, talked to Epps in the Sacramento courthouse coffee shop, and asked appellant how he had been doing. Epps replied that he hadn't been doing too much and said: "I've got it set down; I am still missing something." Gorman asked: "What are you missing, phenyl-2?" Epps replied: "Yes, it is kind of hard to get. The Feds are making everybody register when you go to buy it and on the street it sells for somewhere around $200 a pint of phenyl-2, whereas if I buy it from a wholesaler, . . ."

On March 18, 1971, Gorman proceeded to Rio Linda, where he saw Epps and Freeland together. After the police announced themselves, Epps fled, but was caught. The officers searched a 1959 white Ford at the residence and saw two boxes, one containing chemical glassware, and the other numerous chemicals. The officers turned in reports on their discovery and three or four months later Epps was arrested for the sale of methamphetamine in proceedings unrelated to this appeal.

I

Officer Sanchez testified concerning his observations and actions up to and including the arrest of the two defendants. He then was asked if he had a conversation with the defendant Freeland, whom he had transported to the jail. Appellant's attorney objected to the relevancy of the evidence, and requested that the prosecutor make an offer of proof, and that he have an opportunity to *voir dire* the officer out of the presence of the jury. The jurors were excused, and the deputy district attorney stated, ". . . This witness had a conversation with the defendant Freeland whereby the defendant Freeland admitted that he was in the laboratory for the purpose of

---

[2]The supervising criminalist for the Alameda County Sheriff's Department testified that the most common method of producing speed (methamphetamine) is one of reduction, i.e., "cooking," which is accomplished through a series of reactions involving phenyl-2 propanone or phenyl acetone, aluminum, sodium hydroxide, and ether.
 The president of the laboratory company testified that at the time of the break-in the laboratory did not, to his knowledge, contain any phenyl-2 propanone although it had carried it four or five years ago. He could not say from his knowledge of the wholesale chemical business whether most chemical warehouses carried the chemical.

obtaining drugs . . . he did so after being fully advised of his Miranda rights." Thereupon the witness was examined on *voir dire* by the attorney for codefendant Freeland, and the court, after hearing the testimony, ruled that Freeland had been properly advised of his *Miranda* rights and had waived them.

Sanchez then testified that the conversation was initiated by Freeland who asked Sanchez, as the officer was placing him in the patrol car, what he had been arrested for; that Sanchez told him that he was arrested for burglary; that Freeland then asked "What about the other guy?"; that Sanchez told him that appellant was also being arrested for burglary and Freeland said he did not even know "the other guy"; and that Freeland volunteered, "Man, I just went in to get some tools" because he was having some problem with his car.[3] It was at this point, after Freeland was in his car, that the officer advised him of his rights.

Sanchez then asked Freeland his name and he replied that it was Epps. Sanchez said, "Epps?" and Freeland said, "Well, you're going to find out anyway. I better quit lying. My name is Gregory Freeland." Sanchez asked, "Well, who is Epps?" and Freeland said, "Epps is the other guy." When Sanchez pointed out to Freeland that he had earlier said he didn't know the other man, Freeland said: "I know him." Freeland then said, "Man, what am I going to do?" and Sanchez told him that he should see an attorney. Freeland then said, "Not again," "Got caught again," and ". . . I went into the . . . building to look for some . . . drugs, got caught in the . . . lab, got caught again, . . . What . . . am I going to do?" The officer further testified that old needle marks were found on Freeland's arm at the time of booking.

At this time no *Bruton* or other objection was interposed by appellant's attorney. Both he and Freeland's attorney cross-examined the officer in a manner which revealed they were attempting to show that Freeland had been telling the truth about entering the building to secure tools to repair the car; that any admission of an attempt to take the chemicals referred to an afterthought of Freeland; and that such admission was either a result of the officer's persuasion, or was a result of a mix-up in the officer's observation, recollection and reporting.

Shortly before the conclusion of the People's case, on the day before the case was argued to the jury, appellant's attorney made a motion to strike,

[3]A police officer testified that he observed the engine of the green automobile and did not see anything out of place nor notice anything unusual about it. In addition, there was evidence that there were several gas stations in the immediate vicinity, and at least one of them was open at the time of the incident.

or in the alternative to limit the testimony given by Officer Sanchez regarding Freeland's statements, as hearsay as to Epps, and he asked that the jury be properly admonished in that regard. He pointed out, "Mr. Freeland admitted to participation in the burglary, that he went in to get drugs, something like that. And that is hearsay as to Mr. Epps." When the prosecutor pointed out that he did not believe there was anything in the statement which would implicate Epps, the latter's attorney pointed out: "First of all, he gave his name as Epps, then he said he didn't know the other guy. There is testimony regarding admissions as to what Mr. Freeland's conduct is, which could be considered as creating implications of guilt for Mr. Epps, who was on the scene, and all I am asking is that that testimony be limited to Mr. Freeland." The court then made a finding that the statements attributed to Freeland were not binding on Epps, and agreed to give an appropriate instruction. The clerk's minutes indicate that the following morning there was an unreported conference with the court out of the presence of the jury to discuss instructions and forms of verdict. The jury was given a specific instruction proposed by Freeland, and general instructions predicated on CALJIC Instructions No. 2.08 and 2.09 which had been requested by appellant.[4]

Three questions are presented. Did the statement of codefendant Freeland, as reported by the officer, inculpate appellant Epps in a manner bringing it within the constitutional prohibition of the use of such statements? If so, did appellant waive the right to object to the use of the statement because he failed to make a proper objection? If not, did the admission of the matter in the statement which referred to appellant constitute harmless error? It is concluded that the answer to each of those questions shows that there was no reversible error.

—A—

In *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], as in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], the court was concerned with the invalid confession of a codefendant, received in evidence at a joint trial, which inculpated

---

[4]Those instructions read: "Evidence of conversations between the defendant Epps and Detective Garrison and Agent Gorman have been admitted for a limited purpose. You are instructed that you must not consider such evidence as against the defendant Freeland. Your verdict as to each defendant must be rendered as if he were being tried separately. [¶] Evidence has been admitted of a statement made by a defendant after his arrest. You are again instructed that you must not consider the evidence of such statement as against the other defendant. Your verdict as to each defendant must be rendered as if he were being tried separately. [¶] Certain evidence has been admitted for a limited purpose. You are admonished that it cannot be considered by you for any purpose other than the limited purpose for which it was admitted."

a second defendant. In *Bruton* the court ruled, "We hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." (391 U.S. at p. 126 [20 L.Ed.2d at p. 479].) This conclusion is predicated upon three postulates: (1) "the powerfully incriminating extra-judicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial" (*id.* at pp. 135-136 [20 L.Ed.2d at p. 485]); (2) "since [the codefendant] did not take the stand. . . . [the defendant] was denied his constitutional right of confrontation" (*id.* at p. 128 [20 L.Ed.2d at p. 480]); and (3) "in the context of a joint trial [the court] cannot accept limiting instructions as an adequate substitute for [defendant's] constitutional right of cross-examination" (*id.,* p. 137 [20 L.Ed.2d at p. 485]). Here there was no opportunity to cross-examine the codefendant, and the limiting instructions would be deemed ineffective if the content of the matter of which appellant complains indicates that there was a substantial threat to appellant's right to confront the witnesses against him.

In *People* v. *Aranda, supra,* the Supreme Court of this state had laid down a similar prohibition without reliance on, but with a precognizant appreciation of, the constitutional right of confrontation (63 Cal.2d at pp. 524-527 and 528-529). It also laid down procedures to be followed "[w]hen the prosecution proposes to introduce into evidence an extra-judicial statement of one defendant that implicates a codefendant, . . ." (*Id.* at pp. 530-531, and see I-B below.) In defining "extrajudicial state-ments implicating any codefendant" which could be deleted, the court stated: "By effective deletions, we mean not only direct and indirect iden-tifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise estab-lished." (*Id.* at p. 530, fn. omitted.[5]) In *Roberts* v. *Russell* (1968) 392 U.S. 293 [20 L.Ed.2d 1100, 88 S.Ct. 1921] [rehg. den. (1968) 393 U.S. 899

---

[5]This footnote reads: "The rules governing the cases in which deletion would be a permissible alternative cannot be set out fully. Use of the procedure would depend on the evidence linking the defendants together before and after the crime and on the actual statements made by the declarant defendant. [¶] In the present case, deletion would have been an effective solution to the joint trial problem. All that Martinez's confession added to the case against Aranda was Aranda's identity. No evidence linked the two together at any other time relevant to the commission of the robbery. Deleting all references to Aranda would not have prejudiced Martinez and what re-mained would have prejudiced Aranda no more than if Martinez had in fact said that 'I was one of the persons who robbed the store but I will tell you nothing more.' " (63 Cal.2d at p. 530, fn. 10.)

(21 L.Ed.2d 191, 89 S.Ct. 73)], the United States Supreme Court affirmed that the principles laid down in *Bruton* applied to state trials. (392 U.S. at p. 294 [20 L.Ed.2d at p. 1102].)

■ The statements attributed to Freeland must be examined for their incriminatory effect on Epps. The testimony shows that Freeland asked, "What about the other guy?" This indicates a concern from which could be inferred some association, or acquaintance with the other suspect, which, in turn, could give rise to a common purpose for both in whatever activities were being pursued at that hour of the morning. Freeland allegedly first answered that his name was "Epps." The knowledge of what proved to be the true name of the other person on the scene, gives rise to the same inferences. Similar inferences arise from Freeland's reported recantation and statements, "Epps is the other guy. . . . I know him." The remainder of the statement in which Freeland confessed that he went into the building to look for some drugs and was apprehended did not mention Epps in any way.

In applying the rule suggested in *Aranda* (see fn. 5 above, and accompanying text), it is clear that Freeland's extrajudicial statement was not a material factor in linking the defendants together. In the absence of any explanation, they were immutably linked by their joint presence at 2 a.m. in and about a vacant lot, and an adjoining building which was suspected as the scene of a burglary and which proved to have been forcibly entered. That conclusion was fortified by independent evidence that the two had been seen together as recently as nine days before. Under those circumstances it is arguable that the statement of Freeland contained cumulative evidence linking the two defendants together, but it is equally arguable that the content of the statement did not require the jury to ignore the limiting instruction in order to find that Epps and Freeland were acquainted. The balance of Freeland's statement is no more than a statement that he (Freeland) went into the building (see fn. 5, *supra*). On this analysis there was really no *Bruton* or *Aranda* error in the sense of incompetent evidence which incriminated or inculpated Epps. (See *People* v. *Floyd* (1970) 1 Cal.3d 694, 719 [83 Cal.Rptr. 608, 464 P.2d 64] [cert. den. (1972) 406 U.S. 972 (32 L.Ed.2d 672, 92 S.Ct. 2418)]; *People* v. *Flores* (1968) 68 Cal.2d 563, 568 [68 Cal.Rptr. 161, 440 P.2d 233] [cert. den. (1969) 393 U.S. 1057 (21 L.Ed.2d 698, 89 S.Ct. 697))), overruled on other grounds *People* v. *De Sanitago* (1969) 71 Cal.2d 18, 28, fn. 7 (76 Cal.Rptr. 809, 453 P.2d 353)]; *People* v. *Wallace* (1970) 13 Cal.App.3d 608, 617-618 [91 Cal. Rptr. 643]; and *People* v. *Irvin* (1968) 264 Cal.App.2d 747, 764 [70 Cal. Rptr. 892]. Cf. *People* v. *Fortman* (1970) 4 Cal.App.3d 495, 497-498 [84 Cal.Rptr. 458] [cert. den. (1970) 400 U.S. 880 (27 L.Ed.2d 118, 91 S.Ct. 124)].)

On the other hand, it must be recognized that although it was Epps' presence at the time and place and under the circumstances that had developed at the time of his apprehension which incriminated him, if he had demanded and secured a separate trial, the self-incriminating admissions of Freeland would not be admissible at all.[6] He would, however, be faced with the evidence which linked the two before and at the scene of the break-in, and the objective evidence bearing on the circumstances which existed at the time Freeland was apprehended. None of the cases reviewed in this opinion suggest that it is *Bruton* or *Aranda* error to admit in evidence the admission or confession of one defendant, which reflects his commission of a crime that is revealed by the physical evidence, because it might reflect on the issue of whether or not a crime was actually committed by not only the declarant but also by another, whom evidence, other than the confession, links to the declarant's activities. In fact *Aranda* suggests the contrary. It suggests that if references to the participation of anyone else, whether directly or indirectly identified or not, are nonexistent, or are deleted, the trial may be joint, and the extrajudicial statement may be received as against the declarant (63 Cal.2d at p. 530).

From the statement quoted above (fn. 5 and accompanying text) appellant argues that since Freeland's admission—"Went into the . . . building to look for some . . . drugs, got caught in the . . . lab, got caught again"—might be employed by the jury as against Epps to show, not that he was associated with Freeland (that fact having been conclusively proved by evidence of other circumstances), but to show that the venture in which they were engaged was criminal, and, more specifically, that the breaking and entry were made with the intent to commit theft. It is unnecessary to pursue whatever merit there may be in this suggestion. In the first place, no such objection was interposed at the trial (see subsection —B— below), and, secondly, the evidence taken as a whole leads unalterably to the conclusion that Freeland, who was observed coming out of the premises, was engaged in rummaging around the warehouse after having broken into the premises. There was no error prejudicial to Epps in admitting the cumulative evidence of Freeland's admission under proper limiting instructions (see subsection —C— below).

It should be observed that the right of confrontation discussed in *Bruton,* and the right to be free of incompetent evidence of guilt as discussed in

---

[6]It could not be successfully contended that the statements made by Freeland after his arrest were in furtherance of a conspiracy to commit burglary to secure chemicals. (See Evid. Code, § 1223; *People v. Oldham* (1896) 111 Cal. 648, 652-654 [44 P. 312] and cf. *People v. Wallace* (1970) 13 Cal.App.3d 608, 617-618 [91 Cal.Rptr. 643].)

*Aranda* refer to extrajudicial declarations which point the finger of suspicion at the complaining defendant. The testimony concerning the codefendant's activities are admissible although prejudicial and incriminating to the non-acting defendant. Whether they are sufficient to convict the defendant is dependent on whether the circumstances show that he was aiding or abetting his codefendant. The risk of the jury being misled by hearing, under a limiting instruction, the codefendant's admission, which does not expressly inculpate the defendant, is not substantially greater than the risk that they will be led to convict an innocent bystander, because of the weight of the other evidence against the codefendant. In the final analysis there must be proof of aiding and abetting the crime charged and committed by the co-defendant.

It is concluded that the record fails to show that the codefendant's extra-judicial statement substantially inculpated or incriminated the appellant.

—B—

In *People* v. *McGautha* (1969) 70 Cal.2d 770 [76 Cal.Rptr. 434, 452 P.2d 650] [affd. on def. McGautha's pet. for cert., sub nom. *McGautha* v. *California* (1971) 402 U.S. 183 (28 L.Ed.2d 711, 915 S.Ct. 1454)], Mc-Gautha's codefendant Wilkinson, who was convicted of two counts of armed robbery and one for murder, complained that evidence concerning McGautha's extrajudicial statements which indicated that Wilkinson had been involved in the robbery of a store in which a man had been shot were received in evidence in violation of *Bruton*. In that case, as in this, when objection was made the court did instruct the jury not to consider the state-ments against Wilkinson. Unlike this case, the objections, when made, were at the trial and the admonition was given then; no admonition was given with the general instructions. (See 70 Cal.2d at p. 784.) The court alluded to the prophylactic procedures prescribed by *Aranda*[7] and concluded, "De-fendant Wilkinson, however, neither sought a severance nor requested the deletions and exclusions authorized by *Aranda*. Having failed to exercise his right to bar the introduction of incriminating extrajudicial statements by

---

[7] These procedures were enunciated as follows: "In *Aranda* we held that, if the prosecution proposes to introduce an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of three procedures. '(1) It can permit a joint trial if all parts of the extrajudicial statements implicating any co-defendants can be and are effectively deleted without prejudice to the declarant. . . . (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible.' (*People* v. *Aranda, supra,* 63 Cal.2d 518, 530-531.)" (70 Cal.2d at p. 785.)

McGautha, defendant Wilkinson cannot now complain of any resulting prejudice." (*Id.* at p. 785. See also *People* v. *Floyd, supra,* 1 Cal.3d 694, 720; *People* v. *Wallace, supra,* 13 Cal.App.3d 608, 617 and 618-619; *People* v. *Simms* (1970) 10 Cal.App.3d 299, 307-308 [89 Cal.Rptr.1]; and *People* v. *Irvin, supra,* 264 Cal.App.2d 747, 764.)

In *McGautha* the court pointed out that Wilkinson was on notice of the existence, content and probable use of the testimony concerning the extrajudicial statements of McGautha because testimony relating to the statements was given at the preliminary examination (70 Cal.2d at p. 785). In *Aranda* the court pointed out that Aranda erroneously had been denied discovery of extrajudicial statements obtained from his co-defendant by the police, and that he was entitled to such information. (63 Cal.2d at p. 527, fn. 6; and see *People* v. *Martin* (1971) 17 Cal.App.3d 661, 671 [95 Cal.Rptr. 250].) ▆ In this case the record indicates that Freeland's attorney, the public defender, had a copy of the police report of his client's statement because, when the officer was examined on *voir dire,* he used it to bring out that his client first stated that he was searching for tools. It may be assumed that when the public defender withdrew as the attorney for Epps and was replaced by separate appointed counsel over seven weeks before the trial, he advised new counsel of the available information. In any event, appellant's counsel, having heard the same testimony elicited from the officer on *voir dire,* had ample opportunity at that time to request deletion of part, or exclusion of all of the testimony concerning the extrajudicial statement of Freeland and failed to do so. As stated in *McGautha,* having failed to exercise his right to bar the introduction of what he deems to be incriminating extrajudicial statements of his codefendant, he cannot now complain of any resulting prejudice.

—C—

In *Harrington* v. *California* (1969) 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726], the court reviewed a conviction which had been affirmed in *People* v. *Bosby* (1967) 256 Cal.App.2d 209 [64 Cal.Rptr. 159] where the court, as to three defendants, had applied the rule that when the detailed confession of each shattered his own case, there was no prejudice by a violation of the *Aranda* rule if the confession of another referred to the complaining defendant. (256 Cal.App.2d at pp. 213-217; and see *People* v. *Lara* (1967) 67 Cal.2d 365, 392-393 [62 Cal.Rptr. 586, 432 P.2d 202] [cert. den. (1968) 392 U.S. 945 (20 L.Ed.2d 1407, 88 S.Ct. 2303)]; and *People* v. *Charles* (1967) 66 Cal.2d 330, 338 and 343-344 [57 Cal.Rptr. 745, 425 P.2d 545] [cert. den. (1967) 389 U.S. 872 (19 L.Ed.2d 153, 88 S.Ct. 159)].) As to the defendant Harrington, who was implicated by the con-

fessions of the other three, there was no confession, only admissions. The state court examined these admissions and other evidence offered against him, and concluded: ". . . it is virtually inconceivable that any jury could have escaped the conclusion that Harrington was engaged in an attempted robbery and was answerable for the murder committed by his co-conspirator in the course thereof." (256 Cal.App.2d at p. 217.) The United States Supreme Court stated, "We held in *Chapman* v. *California,* 386 U.S. 18, that 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' *Id.,* at 24. We said that, although 'there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error' (*id.,* at 23), not all 'trial errors which violate the Constitution automatically call for reversal.' *Ibid.*" (395 U.S. at pp. 251-252 [23 L.Ed.2d at pp. 286-287].) After examining the references to the defendant in the confessions of his codefendants (one of whom was subjected to cross-examination by defendant's counsel) in the light of defendant's admissions and the testimony of others, the court concluded: ". . . the case against Harrington was so overwhelming that we conclude that this violation of Bruton was harmless beyond a reasonable doubt, unless we adopt the minority view in *Chapman* (386 U.S., at 42-45) that a departure from constitutional procedures should result in an automatic reversal, regardless of the weight of the evidence." (*Id.* p. 254 [23 L.Ed.2d pp. 287-288].) The opinion states, "It is argued that we must reverse if we can imagine a single juror whose mind might have been made up because of Cooper's and Bosby's confessions and who otherwise would have remained in doubt and unconvinced. We of course do not know the jurors who sat. Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury." (*Id.*)

The courts of this state have applied the foregoing test of harmless error to preclude reversal in the face of a claim of alleged *Bruton* error. (See *People* v. *Floyd, supra,* 1 Cal.3d 694, 721; *In re Whitehorn* (1969) 1 Cal. 3d 504, 517 [82 Cal.Rptr. 609, 462 P.2d 361]; *In re Lara* (1969) 1 Cal.3d 486, 489-490 [82 Cal.Rptr. 628, 462 P.2d 380]; *In re Hill* (1969) 71 Cal.2d 997, 1013-1015 [80 Cal.Rptr. 537, 458 P.2d 449] [cert. den. (1970) 397 U.S. 1017 (25 L.Ed.2d 432, 90 S.Ct. 1254), reversed as to one defendant on other grounds *In re Saunders* (1970) 2 Cal.3d 1033, 1049-1050 (88 Cal.Rptr. 633, 472 P.2d 921)]; *People* v. *Flores, supra,* 68 Cal.2d 563, 568; *People* v. *Sosa* (1972) 26 Cal.App.3d 514, 518-519 [103 Cal.Rptr. 58]; *People* v. *Martin, supra,* 17 Cal.App.3d 661, 670-672; *People* v. *Wade* (1971) 15 Cal.App.3d 16, 23-24 [92 Cal.Rptr. 750] [cert. den. (1972) 405 U.S. 925 (30 L.Ed.2d 797, 92 S.Ct. 972)]; *People* v.

*Wallace, supra,* 13 Cal.App.3d 608, 619; *People* v. *Simms, supra,* 10 Cal. App.3d 299, 316-317; *People* v. *Williams* (1970) 6 Cal.App.3d 274, 279 [85 Cal.Rptr. 675]; *People* v. *Fortman, supra,* 4 Cal.App.3d 495, 498-500; and *People* v. *Schwartzman* (1968) 266 Cal.App.2d 870, 886-889 [72 Cal.Rptr. 616]. Cf. *In re Sears* (1969) 71 Cal.2d 379, 387-388 [78 Cal. Rptr. 180, 455 P.2d 116].)

In *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] [rehg. den. (1967) 386 U.S. 987 (18 L.Ed.2d 241, 87 S.Ct. 1283)], the court observed, "Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." (386 U.S. at p. 24, fn. omitted [17 L.Ed.2d at p. 710]. See also *People* v. *Gardner* (1968) 266 Cal.App.2d 19, 25-27 [71 Cal.Rptr. 568].) (3) Appellant asserts that the prosecution has failed to show that the error was harmless beyond a reasonable doubt. In view of the uncontradicted testimony concerning the prior relationship between Epps and Freeland, the testimony of Epps' desire to secure certain chemicals, the total circumstances surrounding the defendants' apprehension and arrest, and the absence of any evidence tending to explain their presence at that time and place, this court has no hesitancy in concluding that the error, if any, in permitting the jury to consider the admissions of Freeland, under a limiting instruction, was harmless beyond a reasonable doubt.

The only countervailing consideration is the fact that the jury took almost nine and one-half hours of deliberation on two days to arrive at a verdict. During this period the jurors not only called for the exhibits, but also requested further instructions on three occasions. Reference to the inquiries on these occasions reveals that the issue involved was the distinction between burglary and attempted petty theft (see part III below). It cannot be assumed that the jury were perplexed about the relationship between appellant and his codefendant as revealed by the statement. Rather it appeared that they were confused as to the effect of the established and admitted entry.

No reversible error is found in the manner of admitting the testimony concerning the codefendant's statement.

## II

The failure of appellant's attorney to raise either a *Bruton* or an *Aranda* objection at the trial gives rise to the shopworn contention that he

was denied the effective assistance of counsel. (See *People* v. *Ibarra* (1963) 60 Cal.2d 460, 464-466 [34 Cal.Rptr. 863, 386 P.2d 487].) If the statement of the codefendant did not fall within the proscription of those cases (see part I-A above), or, if it did, and was nevertheless not prejudicial (see part I-C above), there is no necessity of pursuing this contention.

It is patent, however, that appellant has failed to make out a case for relief because of his trial attorney's failure to object. *Ibarra* states: "It is counsel's duty to investigate carefully all defenses of fact and of law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled. [Citations.]" (60 Cal.2d at p. 464.) Appellant contends that the interposition of the *Miranda* objection, the failure to object on *Bruton* grounds, and the delayed hearsay objection and request for a limiting instruction demonstrate that defendant was unfamiliar with what was then a well established exclusionary rule. He also contends that there was no tactical advantage to be gained by failure to exclude the statement.

*Ibarra* requires that an omission, even when predicated upon unawareness of a rule of law basic to the case, must reduce the trial "to a farce and a sham." (60 Cal.2d at p. 466.) In *People* v. *Floyd* (1970) 1 Cal.3d 694 [83 Cal.Rptr. 608, 464 P.2d 64], the court pointed out, "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations.] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (1 Cal.3d at p. 709. See also *People* v. *McGautha, supra,* 70 Cal.2d 770, 783-784; *People* v. *Hill* (1969) 70 Cal.2d 678, 688-691 [76 Cal.Rptr. 225, 452 P.2d 329] [cert. den. (1972) 406 U.S. 971 (32 L.Ed.2d 671, 92 S.Ct. 2416)]; *People* v. *Simms, supra,* 10 Cal.App.3d 299, 313-316; and *People* v. *Doebke* (1969) 1 Cal.App.3d 931, 937-938 [81 Cal.Rptr. 391].)

It cannot be assumed that appellant's trial counsel was ignorant of the *Bruton* and *Aranda* rules. He might have believed as set forth above (part I-A), and as stated by the deputy district attorney at the trial, "I don't believe there was anything in the testimony of the officer which would implicate the co-defendant." Furthermore, there was some tactical advantage in having the testimony concerning Freeland's statement before the jury, particularly with a limiting instruction. Appellant's counsel could, therefore, on the one hand, allude to Freeland's original statement that he was attempting to get some tools to repair the car, and on the other hand, point out that Freeland's admission of entry for drugs could not bind his client.

Appellant has failed to make out a case for relief on the ground of ineffective assistance of counsel.

## III

Appellant requested 30 instructions, 29 of which were listed by reference to CALJIC numbers, and one composed on the basis of Evidence Code section 1235. The court gave all but one of those instructions. No complaint is made of the refusal to give that instruction. Included was a request for CALJIC Instruction No. 17.10, which deals with lesser included offenses. (See Pen. Code, § 1159; *People* v. *St. Martin* (1970) 1 Cal.3d 524, 532-533 [83 Cal.Rptr. 166, 463 P.2d 390]; *People* v. *Cooper* (1968) 268 Cal.App.2d 34, 36-39 [73 Cal.Rptr. 608]; *People* v. *Morrison* (1964) 228 Cal.App.2d 707, 712-714 [39 Cal.Rptr. 874]; and Witkin, Cal. Criminal Procedure (1963) § 480, p. 486 and §§ 541-543, pp. 552-555.) It was accompanied by a notation "(Trespass and Petty Theft)." The information charged appellant and his codefendant with "Burglary, a violation of Section 459 of the Penal Code of the State of California, in that on or about the *27th* day of *March, 1971,* in the County of Alameda, State of California, they entered a building, to wit: the business establishment of BRYANT LABORATORY located at 880 Jones Street in the City of Berkeley, County of Alameda, State of California, with intent to commit theft." The court properly refused to give an instruction on criminal trespass as a lesser included offense. (*People* v. *Harper* (1969) 269 Cal. App.2d 221, 222-223 [74 Cal.Rptr. 859]; *People* v. *Lopez* (1967) 249 Cal.App.2d 93, 102-103 [57 Cal.Rptr. 441]; *People* v. *Mitchell* (1966) 239 Cal.App.2d 318, 327-328 [48 Cal.Rptr. 533]; and *People* v. *Harris* (1961) 191 Cal.App.2d 754, 757-759 [12 Cal.Rptr. 916].)

The court defined burglary to the jury in the language of CALJIC Instruction No. 14.50, and, as requested by appellant, followed this with Instruction No. 14.56, to the effect that the offense if committed was second degree as a matter of law, and Instruction No. 17.00 regarding several defendants. The court then gave a general instruction on attempt in the language of Instruction No. 6.00, and followed it with the following instruction: "Every person who attempts to steal, take, carry, lead or drive away the personal property of another with the specific intent to deprive the owner permanently of his property, is guilty of theft by larceny. In this case it is known as attempted petty theft." The next instruction was in the language of Instruction No. 17.10, and concluded: "The offense of burglary, with which each defendant is charged, necessarily includes the lesser offense of attempted petty theft." The jury were given three verdict forms with respect to each defendant, and they were told they could find

each either not guilty, guilty of burglary, or guilty of a lesser included offense, to wit, attempted petty theft.

In so doing the court gave the defendants more than their due. As early as 1866 it was established that larceny, if committed at the same time as a burglary, is not an included offense of the burglary. In *People* v. *Garnett* (1866) 29 Cal. 622 the court stated, "Our criminal code . . . [Stats. 1850, ch. 99, § 58, p. 235, as amended Stats. 1858, ch. 245, § 1, p. 206, reading similarly to Pen. Code, § 459] describes no such offense as burglary complicated and mixed with another felony. It describes simple burglary only. Hence under our practice burglary cannot, more than any other offense, be united in the same indictment with another offense. If in addition to the burglary, another offense has been committed, it must be made the foundation of a separate indictment." (29 Cal. at p. 626.) The trial court instructed on larceny when the jury appeared deadlocked on the issue of burglary. The defendant's conviction of larceny was reversed. The court further observed, "Larceny is not necessarily included in burglary, like manslaughter in murder, within the sense of the statute; on the contrary it is no part of it. The offense of burglary is complete without any larceny being committed. The relation contemplated by the statute does not exist between burglary and such other felony, if any, as may chance to be committed by the defendant at the same time." (*Id.* at p. 628.) These principles have been uniformly followed. (See *People* v. *Curtis* (1888) 76 Cal. 57, 58 [17 P. 941] [overruled on the issue that erroneous conviction of a lesser offense was not an acquittal of the charged major offense in *In re Hess* (1955) 45 Cal.2d 171, 176 (288 P.2d 5)]; *People* v. *Devlin* (1904) 143 Cal. 128, 130 [76 P. 900] [questioned on suggestion that one can be punished for both burglary and the larceny attendant thereto in *In re Dowding* (1961) 188 Cal.App.2d 418, 423-424 (10 Cal.Rptr. 392); and see Pen. Code, § 654; and *People* v. *McFarland* (1962) 58 Cal.2d 748, 760-763 (26 Cal.Rptr. 473, 376 P.2d 449)]; *People* v. *Snyder* (1925) 74 Cal.App. 138, 141-142 [239 P. 705] [disapproved on double punishment issue, *People* v. *McFarland, supra,* 58 Cal.2d 748, 762]; *People* v. *Shaffer* (1927) 81 Cal.App. 752, 754-755 [254 P. 666] [subject to similar criticism on double punishment]; *In re Howe* (1955) 135 Cal.App.2d 604, 605 [287 P.2d 510]; and *People* v. *Hamilton* (1967) 251 Cal.App.2d 506, 510 [59 Cal.Rptr. 459].) Unless estopped by having requested the instruction, appellant, if he had been convicted of attempted petty theft, would have been entitled to his release. (*In re Howe,* 135 Cal.App.2d 604, 606-607 [287 P.2d 510].)

After the jury had been out 15 minutes it was furnished certain exhibits it requested. Fifty minutes later, shortly before noon, the foreman sent out a note reading, "Requesting-Rereading of Petty Theft & Burglary. . . ." No

action was taken on this note until the jury returned after a two-hour lunch period. The court then reread the instructions it had given on burglary, attempt, attempted petty theft (as quoted above), and lesser included offense. In introducing the quoted instruction the court prefaced it by stating, "This is theft by larceny defined: . . ." The jury then deliberated for two hours and 35 minutes without reaching a verdict before it recessed for the night.

The following morning, after deliberating for an hour and 35 minutes, the jurors sent in a second note reading, ". . . if Guilty-do we come to lesser charge if not agreed upon whitch [*sic*] charge. . . ." The clerk's minutes reflect that thereafter ". . . all counsel in chambers with court, not reported, note from jury is discussed (no jurors or defendants present in chambers). All counsel agree as to how Court will reply to note." The jurors were brought in some 20 minutes after the note was received, and the court, after ascertaining that the jurors did not want the foregoing four instructions read again, instructed them as follows: "All right, then this is the situation. You can only bring in a verdict that all twelve jurors agree to individually as to each defendant. You can only bring in a verdict that all twelve jurors agree to individually as to each defendant." The foreman indicated that the judge's remarks answered the question, but one juror interjected to request a reading of an undisclosed instruction, and she, in turn, was interrupted by a second juror who asked, "The question is how far up or down can we go?" The court then replied, "You can all agree as to a not guilty verdict as to each defendant. You can all agree to the charge of burglary as to each defendant, or you can all agree to the charge of the lesser included, attempted petty theft. But in any event, if all twelve of you cannot agree to a single verdict as to each defendant, you don't have a verdict."

The juror who had been previously interrupted again spoke up, and at her request the court gave the standard instruction on reasonable doubt (CALJIC No. 2.90) supplemented by a statement, "Reasonable doubt is doubt based on reason." Thereupon, a third juror spoke up and joined the previous juror in suggesting they wanted something else read. At this point in the proceedings appellant's attorney sought the ear of the judge, and, following an unreported conference between court and counsel, the judge announced: "Counsel have suggested, and it is true that all the questions that are asked by the jury should come through the foreman, because otherwise we would have a jury deliberation practically in open Court. Why don't you go back to the jury room, and if you have any further questions you can reduce them to writing, and then I can confer with counsel. We get in a very ticklish position here if I start to ad-lib and help you with your questions, I can create more confusion than there

already seems to be. So I will ask you to do that, and if there are any other instructions that you want reread, I will do that. But basically I don't know what the situation is, but it has been agreed that you can only bring in a verdict as to each defendant that all twelve of you can agree to, and if six want to go one way and six another, that is not a verdict."

The foreman then requested a rereading of the burglary charge and the petty theft charge. The court then read the four instructions which it had read the previous afternoon, but in reading the above-quoted instruction on attempted petty theft it inadvertently inserted the word "grand" so the instruction read, "Every person who attempts to steal, take, carry, lead, or drive away the personal property of another with the specific intent to deprive the owner permanently of his property, is guilty of a theft by *grand* larceny. In this case it is known as attempted petty theft." (Italics added.)

The jurors then deliberated, with an interruption for another two-hour lunch break, for two hours and 20 minutes and then sent in a note reading ". . . Instruction on Petty Theft. . . ." A few minutes later the jurors were returned to the courtroom, and were told by the court: "All right. This is entitled theft by larceny, and our law says that whenever any law or statute of this State refers to or mentions larceny, embezzlement or stealing, said law or statute shall hereafter be read and interpreted as if it were theft, or the word 'theft' were substituted therefor. So for your purposes, larceny and theft are synonymous.

"Definition: Every person who attempts to steal, take, carry, lead, or drive away the personal property of another, with the specific intent to deprive the owner permanently of his property, is guilty of theft by larceny. In this case it is known as attempted petty theft." At the request of the foreman the part following "Definition" was reread, and the court added: "Rather than petty theft as such, it just merely puts the word 'attempted' in front of it."

After one juror conferred with the foreman the latter asked, ". . . Anything outside of that would be some other charge?" and the court replied, "Yes." After the jury retired, appellant's counsel suggested that the court's last answer failed to indicate that anything outside of attempted petty theft could be no offense at all, as well as some other charge. Counsel for Freeland joined in the objection, the report of the remarks was read back, and at the suggestion of the court appellant's counsel drafted an instruction to be passed to the jury. It read, "The judge instructs you that if it is not petty theft it may be some other charge or no crime at all." After further discussion, the prosecutor suggested that the instruction be worded, "If it is

not petty theft it may be burglary or it may be no crime at all." Appellant's counsel objected to that form of instruction. The parties having failed to agree, the court indicated it would permit the jury to deliberate another 40 minutes, and then determine whether or not there was an absolute failure to reach an agreement. Within 15 minutes after the judge so expressed himself, the jury returned with the verdicts of second degree burglary.

■ Appellant contends the foregoing record discloses that the instructions given by the trial court were contradictory, confusing and misleading to the jury, and contained a misstatement of law. ■ "The defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and regardless of how overwhelming the evidence of guilt may be, the denial of such a fundamental right cannot be cured by section 13 of article VI of the California Constitution, for the denial of such a right is in itself a miscarriage of justice within that section. [Citations.]" (*People* v. *Wilson* (1967) 66 Cal.2d 749, 764, fn. omitted [59 Cal.Rptr. 156, 427 P.2d 820]. See also *People* v. *Cooper, supra,* 268 Cal.App.2d 34, 37, 39-40.) In this case the question is not whether all material issues were left to the jury. It in fact appears that at appellant's request, and to his benefit, the jury were improperly requested to determine the issue of whether the defendants had committed the offense of attempted petty theft. The theory upon which these instructions were given is not set forth by appellant or respondent. In the absence of a record of the argument of counsel it may be assumed that there was some concept of no breaking and entering, or a concept of an entry without the requisite intent and then the development of the requisite intent to steal property which was found within. In any event the alleged contradictory, confusing and misleading nature of the instruction is not a matter of constitutional error. Therefore, the following principles are applicable.

■ "Error in an instruction which ordinarily would not prejudice the rights of a defendant may justify a reversal of the judgment where the jury is misdirected or misled upon an issue vital to the defense and the evidence does not point unerringly to the guilt of the person accused. [Citation.] The question for an appellate court under these circumstances is whether, considering the entire record, the challenged instruction may have prejudiced the convicted person's rights. (Const., art. VI, § 4½.) If it is probable that in the absence of a misleading instruction the jury would not have returned the verdict complained of, then there has been a miscarriage of justice within the meaning of the constitutional provision. [Citations.]" (*People* v. *Rogers* (1943) 22 Cal.2d 787, 807 [141 P.2d 722]. See also *People* v. *Jenkins* (1969) 275 Cal.App.2d 545, 551 [80 Cal.Rptr. 257]; *Cannis* v. *Di Salvo Trucking Co.* (1952) 111 Cal.App.2d 893, 898

[245 P.2d 365]; and *Carlson* v. *Shewalter* (1952) 110 Cal.App.2d 655, 659 [243 P.2d 549] [overruled on other grounds *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 623-624 (327 P.2d 897)].)

On the other hand it is recognized, "In California, an erroneous refusal to give a requested instruction or the giving of an erroneous instruction is not reversible error unless it results in a miscarriage of justice. (Witkin, Cal. Criminal Procedure (1963) § 491, p. 497.)" (*People* v. *Smith* (1968) 265 Cal.App.2d 775, 779-780, fn. omitted [71 Cal.Rptr. 557].) In *People* v. *Ramirez* (1969) 2 Cal.App.3d 345 [82 Cal. Rptr. 665], which both sides recognize as expressing the principle applicable to this case, the court stated: ". . . since the presumed error was in the instructions to the jury, the test to be applied is that of article VI, section 13 of our Constitution, that is, whether there has been a miscarriage of justice. '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People* v. *Watson,* 46 Cal.2d 818, 836. . . .)" (2 Cal.App.3d at p. 357. See also *People* v. *Laster* (1971) 18 Cal.App.3d 381, 393 [96 Cal.Rptr. 108]; *People* v. *Nichols* (1967) 255 Cal.App.2d 217, 223 [62 Cal.Rptr. 854]; and *Cannis* v. *Di Salvo Trucking Co., supra,* 111 Cal.App.2d 893, 898.) In *People* v. *Nichols, supra,* the court stated, "To determine whether error has been committed this court must consider jury instructions as a whole. [Citations.]" (255 Cal.App.2d at p. 222.)

Appellant asserts that the fact that the jury requested three readings of the instructions demonstrates that they were confusing. It is equally arguable that the confusion was in the mind of one or more jurors as an attempt was made to apply the instructions to the evidence in the case. The court's remarks after being subjected to requests from several jurors do not, as urged by appellant, demonstrate that the instructions were confusing, rather, those remarks express the court's fear that a lack of orderly procedure in requesting instructions would, if unchecked, perhaps lead to remarks which might prove confusing.

The instruction under which the court engrafted language of attempt upon the normal definition of theft by larceny (see CALJIC No. 14.02) does have somewhat of an inherent contradiction in that it may literally be read as defining an attempt to steal as the equivalent of larceny. The interposition of the word "grand" on one rereading and the statement "This is entitled theft by larceny" on another occasion admittedly would not lessen the confusion. Nevertheless, the instruction must be considered with others as a whole, i.e., with the instruction on attempt, the concluding phrase "In

this case it is known as attempted petty theft," and the instructions as to the three possible verdicts. (See *People* v. *Nichols, supra,* 255 Cal.App.2d 217, 221-223.) With that perspective it does not appear probable that the jury were misled by the instruction. The evidence, insofar as appellant was concerned, pointed to his aiding or abetting in burglary or no crime at all. He was improperly favored rather than prejudiced by any reference to a lesser offense. The record fails to show that appellant himself did not prepare and request the very instruction which he now contends was contradictory, confusing and misleading. No prejudicial error has been demonstrated in the instructions as given.

■ Finally, appellant asserts that the court's answer to the ultimate question asked by the foreman, and its failure to give the requested ameliorating instruction caused prejudicial error because it created a conflict between the presumption of innocence, and what appellant interprets as a direction by the court to find the defendants either guilty of burglary or attempted petty theft. It is true that the court's bare statement, "Anything outside of attempted petty theft would be some other charge" could be interpreted as "Anything outside of petty theft would be burglary." Nevertheless, the jurors were instructed on several occasions that there were three possible verdicts for each defendant. They had the verdict forms before them. If the question is interpreted as, "Any wrongdoing outside of attempted petty theft would be some other charge?", the court's affirmative answer would not be deemed erroneous or prejudicial. The jurors certainly knew that the prosecution had to establish either burglary or attempted petty theft by the standard of proof required in criminal cases. If, as suggested by appellant, they merely wanted to punish appellant for a general wrongdoing it is fair to assume that they would have selected the lesser offense. The court's remarks did not interfere with that choice. Moreover, because of the state of the evidence, and the fact that the confusion, if any, was engendered by appellant's request for instructions on the lesser offense, no prejudicial error is found.

In the discussion concerning the last question and answer the judge remarked: "All I can see is that the jury apparently feels that there was something done there at that place that shouldn't have been. Maybe it was destroying personal property of another, or malicious mischief, or something like that. That is what they are thinking about, and that is what they mean by 'some other charge'. I don't think that the foreman or they had burglary in mind at all. It looks to me like they have boiled this down to a question, they are arguing whether or not there was an attempt at petty theft, and if they are saying that this definition that I have read them, the facts don't fit it, therefore it would be something else, not necessarily burglary by any means. You would think by the request for this instruction

that they had abandoned the burglary aspect." This proved to be an erroneous prediction, but it does not demonstrate that the jury were misled into finding a burglary was committed. Any capital to be gained from the judge's remarks would more appropriately have been sought by way of a motion for new trial.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.